# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  08-171 (HHK)** |
| | : | |
| **v.** | : | |
| | : | |
| **MARK STUBBLEFIELD** | : | |
| | : | |

## GOVERNMENT'S OMNIBUS OPPOSITION

The United States of America, by and through its attorney, the United States Attorney for the

District of Columbia, hereby files this omnibus opposition to defendant's pre-trial motions in this

case.  In support of this opposition, the government relies upon the points and authorities set out in

this memorandum and at any hearing on this matter.

## I.     Factual Background

The defendant has been charged in a seven count indictment with six counts of bank robbery,

in violation of 18 U.S.C. § 2113(a), and one count of attempted bank robbery, in violation of 18

U.S.C. § 2113(a).  Between January 29, 2008, and April 21, 2008, the defendant robbed six banks

in Washington, D.C., and attempted to rob an additional bank in the District.[1]  A timeline of this

crime spree follows.

On January 29, 2008, the defendant robbed Washington First Bank, located at 1500 K Street,

NW, Washington, D.C..  At approximately 2:10 p.m.  that day, the defendant entered the bank

wearing a black puffy ski jacket, a dark knit skull cap, dark blue jeans, and black sunglasses, and

handed a teller a handwritten note which read: "Excuse me," "robbery" and "I got a gun."  The

defendant then placed his left hand into his jacket, as if grabbing a weapon.  The bank teller gave the

---

[1] During this period of time the defendant also robbed at least one bank in Arlington, Virginia.  Information about that robbery was provided in the government's Notice of Intent to Introduce Other Crimes Evidence.

defendant $2,817.00 in cash from the teller drawer, which the defendant stuffed in his jacket.  During the robbery, the defendant told the teller to "move it."  Upon receiving the money, the defendant fled the bank.

On March 21, 2008, the defendant robbed United Bank, located at 1875 I Street, NW, Washington, D.C.  At approximately 4:28 p.m. that day, the defendant entered the bank and handed a teller a handwritten note which read: "This is a robbery.  No one will be hurt.  Give me all the big bills."  The teller gave the defendant $4,300.00 in cash.  The defendant retrieved the note and fled the bank.

On March 26, 2008, the defendant again robbed Washington First Bank, located at 1500 K Street, NW, Washington, D.C.  At approximately 9:05 a.m. that day, the defendant entered the bank wearing a hat and a dark puffy jacket.  He placed a note on a teller's counter.  The teller did not have time to read the note before the defendant started yelling "this is a robbery, large bills, give me large bills.  Hurry up."  The teller handed the defendant $1,250.00 from the teller drawer.  The defendant retrieved the note and fled the bank.

Less than twenty minutes later on that same day, the defendant attempted to rob Urban Trust Bank, located at 1350 I Street, NW, Washington, D.C., just a few blocks from the Washington First Bank.  At approximately 9:19 a.m., the defendant, wearing a black down jacket, dark blue jeans, and a black beret, entered the bank.  He handed one of the bank tellers a note which read: "This is a robbery hand me large bills."  The teller explained to the defendant that she didn't have a cash drawer.  (This was because the bank had just opened and the teller was still getting set up for the day.)  The defendant  replied "give me something, give me something."  The teller again tried to explain that she had no cash, and gave the note back to the defendant.  The defendant then went to

2

a second teller, who was unaware of what had happened to the first teller.  When the defendant went to the second teller, the first teller activated the bank's silent alarm.  The second teller advised the defendant that she had only small bills.  The defendant reached into his jacket, and the second teller, fearing that the defendant was armed, ran into a back room, while the first teller dropped beneath the bank counter to hide.  There were no other tellers or customers in the bank lobby, so the defendant fled.

On April 7, 2008, the defendant robbed (for the third time) Washington First Bank, located at 1500 K Street, NW, Washington, D.C.  At 9:19 a.m. that day, the defendant, wearing a tan trench coat and carrying an open black umbrella approached a teller window screaming "This is a robbery! Give me large bills."  The umbrella served to block the defendant's face from the bank surveillance cameras, but did not serve to block the defendant's face from the people in the bank.  The defendant advised two bank employees "Do not move!"  One employee was seated at the entrance to the bank, and pressed the silent alarm.  When the defendant arrived at the teller window, a bank teller provided him with $100 from a teller drawer.  This $100 consisted of five twenty dollar bills of "bait" money. After the bank teller provided the defendant with the $100 in bait money, she said "I do not have any large bills" and displayed an empty teller drawer.  The defendant responded "Yes you have.  Give me all $100 bills. This is a robbery.  Hurry up!"  The defendant then reached into his trench coat as though reaching for a weapon.  The bank teller then accessed a lower bank drawer which contained additional banking funds.  The bank teller provided the defendant with the money from this lower drawer.  As this was happening, the defendant continued screaming "Give me all your large bills!" As the bank teller was collecting this money, another bank employee entered the bank lobby, where the robbery was taking place.  The defendant said to the bank employee "Stop!  Don't move!"  The

defendant then took the additional money from the bank teller and fled the scene with a total of $2,657.00 in bank funds.

On April 11, 2008, the defendant robbed United Bank, located at 1875 I Street, NW, Washington, D.C., for the second time.  At approximately 1:50 p.m. that day, the defendant, wearing a blue jean jacket, blue jeans, a dark baseball hat, and large brown glasses, entered the bank and went to the same teller window he had robbed on March 21, 2008, where he held up a demand note which read "this is a robbery, give me large bills."  The defendant then said "only large bills."  The teller retrieved $4,000.00 in cash from the bank drawer.  As the teller did this, the defendant was reaching and grabbing money from the teller's hand and placing it in his pocket

On April 21, 2008, the defendant robbed Commerce Bank, located at 1753 Connecticut Ave, NW, Washington, D.C.  On that day, at approximately 11:30 a.m., the defendant entered the bank wearing glasses, a tan fisherman's hat, and dark clothing.  The defendant approached a teller window, where he handed a bank teller a wadded up note.  The teller began to open the note to read it, but before the teller could do so, the defendant said "This is a stickup.  Give me all your money."  The defendant then asked for the note  back.  As the bank teller handed cash to the defendant, the defendant said  "All your bills, big bills."  Upon receiving $620.00 in cash, the defendant fled the bank.

After the April 7, 2008 robbery of Washington First bank, law enforcement reviewed surveillance footage taken by cameras maintained by the Capital Hilton Hotel, located on the corner of 16th and K Streets, NW, which is located on the same block as the Washington First Bank.  The footage showed that within moments of the April 7, 2008 robbery of Washington First Bank, a black male wearing a trench coat and carrying an umbrella ran up to the side entrance of the Capital Hilton

4

Hotel on K Street, NW.  The footage then shows the suspect entering the hotel lobby and exiting through the front door onto 16th Street, Northwest.  Upon exiting through the front door, the suspect attempted to enter a waiting cab.  He was stopped by a hotel bellboy and directed to another cab.  Video surveillance shows the suspect entering a cab, which then drove away.

The FBI located and interviewed the cab driver who picked up the suspect from the front of the Capitol Hilton Hotel on April 7, 2008.  The cab driver said he dropped the suspect off at the corner of 7th Street, NW, and Florida Avenue, NW, and that the suspect paid his fare in cash, with a twenty dollar bill.  The cab driver provided the FBI with the funds he received while working on April 7, 2008.  Inspection of that currency revealed a twenty dollar bill with a serial number matching the serial number of one of the twenty dollar "bait" bills which was stolen from Washington First Bank on April 7, 2008.

One of the victim bank tellers met with a Secret Service sketch artist, who composed a sketch of the suspect.  This sketch was circulated throughout Washington, D.C. by the Metropolitan Police Department (MPD) and the Federal Bureau of Investigation (FBI).  While canvassing the city with a flyer containing the sketch, an FBI agent encountered a citizen who identified the subject of the sketch as someone he/she knew.  The citizen further indicated that the suspect frequented the area surrounding 7th Street, NW, and Florida Avenue, NW.

On May 12, 2008, the citizen contacted the FBI agent and stated that the suspect was located at 7th Street, and Rhode Island Avenue, Northwest.  Metropolitan Police Officers responded to the scene in a marked police car.  As the police officers approached, the suspect, later identified as the defendant, fled on foot.  A chase ensued, and the defendant was apprehended at the rear of 626 S Street, Northwest.  The defendant was subsequently arrested for possession of drug paraphernalia.

At this time, the defendant provided the name of Michael Smith.

The defendant was taken to Metropolitan Police Headquarters, and placed in a holding room. The defendant was not handcuffed while in this room.  While waiting to be interviewed, the defendant yelled for law enforcement to return to the room in which he was waiting, and MPD Detective Elmer Baylor responded immediately.  Detective Baylor advised the defendant that Detective Baylor was trying to locate some coffee for the defendant, but was unable to do so. Detective Baylor then asked the defendant if he would like a soda, since coffee was unavailable.  The defendant requested soda, and shortly thereafter Detective Baylor returned with a soda for the defendant.  At that time the defendant requested some crackers or candy.  Detective Baylor left and returned minutes later with some crackers, which the defendant promptly ate.  After the defendant had something to eat and drink, Detective Baylor proceeded to ask the defendant a series of background questions, to include the defendant's last name, first name, middle name, nickname, address, date of birth, age, social security number, height, weight, and place of birth.  Detective Baylor advised the defendant that he was in custody for possession of drug paraphernalia.  Detective Baylor then read the defendant his <u>Miranda</u> rights, at which time the defendant invoked his right to counsel, although he refused to sign the rights card.  No questions about the bank robberies were asked before the defendant was Mirandized, and no additional questions were asked at all once the defendant invoked his <u>Miranda</u> rights.  This process was recorded on a VHS tape which has been provided to defense counsel.

After the interview was stopped, the defendant was fingerprinted and photographed.  The defendant initially resisted giving his fingerprints, and he flexed his fist at one of the police officers down in the cell block.  Law enforcement attempted to subdue the defendant, which resulted in a cut

6

on the defendant's forehead.  During the booking photograph process, the defendant kept filling his cheeks with air, in an attempt to puff them out in an attempt to change his appearance.  The defendant's fingerprints were run through law enforcement databases, which revealed his true name to be Mark Stubblefield.  His photograph was used to create two photo arrays[2] which were shown to the eyewitnesses to the various bank robberies.

Trial in this matter is set for January 26, 2009, and a motions hearing is scheduled for November 21, 2008.  The defendant has filed three pre-trial motions: 1) Motion to Suppress Identification Evidence and Request for Evidentiary Hearing; 2) Motion to Suppress Statements and Related Evidence; and 3) Motion to Sever Counts for Prejudicial Joinder Pursuant to Rule 14.[3]

## II.    Argument

### A.    <u>Motion to Suppress Identification Evidence and Request for Evidentiary Hearing</u>

The defendant asserts that law enforcement used identification procedures that were "unnecessarily suggestive."  The government submits that all of the identification procedures used and the subsequent identifications of the defendant were done properly and resulted in reliable identifications.  Thus, they should not be suppressed.

Those witnesses interviewed by MPD Detectives and FBI agents working together were shown a photo array containing nine color photographs.  Prior to viewing the photo arrays, the

---

[2]  The photo array created by the Metropolitan Police Department contained photographs of nine individuals, including the defendant.  The photo array created by the Federal Bureau of Investigation contained photographs of six individuals, including the defendant.

[3]  The Motion to Suppress Identification Evidence and Request for Evidentiary Hearing and the Motion to Suppress Statements and Related Evidence were filed by the defendant's prior counsel.  However, it is the government's understanding that current counsel has adopted these motions.

witnesses were read the following statement from the Metropolitan Police Department Form PD-122A:

> In a moment, you will be shown some photographs. The group of photographs may or may not contain a photograph of the person who committed the crime of which you are the victim/witness. Sometimes a person looks different in a photograph than in real life because he/she may be wearing or not wearing a hat or glasses; he/she may have a different hairstyle, beard, or moustache; he/she may have gained or lost weight, or he/she is now older than when the photograph was taken. Also keep in mind that how a photograph was taken or developed may make a person's complexion look lighter or darker than real life. So pay attention to facial features. Do not pay attention to any markings or numbers on the photographs or any other differences in the type or style of photograph. They are of no significance.
>
> Take as much time as you need to look at each photograph. Let me know if you see the person who committed the crime. If you pick out one of the photographs, I may ask you some follow up questions. I cannot tell you whether you picked the "right" or "wrong" person, since you were there and I was not. The Metropolitan Police Department will continue to investigate this crime whether or not you pick someone from the group of photographs.
>
> I am going to ask you not to discuss this procedure or any photograph you selected (or did not select) with any witness to this crime.
>
> Do you have any questions before we begin?

The witnesses were then shown the photo array.

Because of scheduling issues, one witness was interviewed by FBI agents without the presence of an MPD detective. This witness was shown a photo array containing six color photographs. Prior to viewing the photo array, the witness was read the following statement:

> In a moment I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards, and moustaches may be easily changed. Also,

> photographs may not always depict the complexion of a person - it
> may be lighter or darker than shown in the photo. Pay no attention to
> any markings or numbers that may appear on the photo or any other
> differences in the type or style of the photographs. When you have
> looked at all the photos, tell me whether or not you see the person
> who committed the crime. Do not tell other witnesses that you have
> or have no identified anyone.

The witness was then shown the photo array.

The witnesses were not asked about or directed to anyone in particular. The witnesses then viewed the photographs, which were all the same size, and which were arranged on a white sheet of paper. None of the photographs had any names printed or written on them. The witnesses were not told the names of any of the individuals in the photographs, nor were the witnesses told the height of any of the individuals in the photographs.[4]

In assessing whether a particular identification procedure violated due process, the Court must undertake the inquiry explained by the Supreme Court in Neil v. Biggers, 409 U.S. 188 (1972). First, this Court must determine whether the identification procedure was unduly suggestive. Manson v. Brathwaite, 432 U.S. 98 (1977). If this Court finds no undue suggestivity, the identification is admissible and no further finding is required. See Neil, 409 U.S. at 196-200.

If, however, this Court finds that the identification procedure was unduly suggestive (not merely suggestive), then the Court examines whether, under the totality of the circumstances, the identification was sufficiently reliable to preclude a substantial likelihood of misidentification. See Manson, 432 U.S. at 113-16. Factors to consider in determining whether the identification remained reliable despite undue suggestive pretrial procedures include the opportunity of the witness to view

---

[4] This is relevant because the defendant's height was one of the characteristics noted by most witnesses. (The defendant is approximately 5"1' tall.)

9

the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior

description of the criminal, the level of certainty demonstrated at the confrontation, and the time

between the crime and the confrontation.  Id. at 114.

In this case, the identification procedure used for each witness was neither merely nor unduly

suggestive, and thus each identification should be admitted at trial.

B.      Motion to Suppress Statements and Related Evidence

The defendant seeks to suppress the defendant's post-arrest statements and actions, including

the defendant's attempts to change the shape of his face by blowing air in his cheeks when he was

photographed.  There is no basis for this argument, and defendant's motion should be summarily

denied.

The questions asked by law enforcement prior to the recitation of his Miranda rights were

routine booking questions, not intended to elicit an incriminating response.  As noted above, the

questions asked included the defendant's last name, first name, middle name, nickname, address,

date of birth, age, social security number, height, weight, and place of birth.  All of these questions

constitute routine booking questions.  The routine booking question exception to the Miranda rule

permits a custodial suspect to be asked questions about his or her name, address, height, weight, eye

color, date of birth, and current age without first being given Miranda warnings.  In Pennsylvania

v. Muniz, a plurality of the Court held that routine booking questions reasonably related to police

administrative concerns do not constitute interrogation and, therefore, do not require Miranda

warnings.  496 U.S. 582, 600-02 (1990). It is well established that routine booking questioning is

not tantamount to "interrogation" that would implicate the Miranda prophylactic safeguards.  See

id. at 601 (questions asked to secure "biographical data necessary to complete booking or pretrial

services" exempt from <u>Miranda's</u> coverage); <u>United States v. Bishop</u>, 66 F.3d 569, 572 n.2 (3d Cir. 1995); <u>United States v. Sweeting</u>, 933 F.2d 962, 965 (11th Cir. 1991) (same); <u>United States v. Horton</u>, 873 F.2d 180, 181 n.2 (8th Cir. 1989) (same; listing cases from First, Second, Fifth, Seventh, Eighth and Eleventh Circuits recognizing "routine booking exception"); <u>United States v. Taylor</u>, 799 F.2d 126, 128 (4th Cir. 1986) (same).

Furthermore, there is no evidence that the defendant's statements were involuntary. Defendant's assertion that the injury suffered by the defendant during the fingerprinting process somehow made his statements involuntary, is inapplicable, as the defendant was questioned *before* he was fingerprinted. Thus, there is no factual basis for defendant's argument that the "officers' treatment of Mr. Stubblefield and Mr. Stubblefield's resulting injury" in any way bears upon the voluntariness of the defendant's statements.

The test for whether a statement is voluntary for purposes of due process is whether the statement is "the product of an essentially free and unconstrained choice by its maker." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225 (1973) (citing <u>Columbe v. Connecticut</u>, 367 U.S. 568, 602 (1961)). For a statement to be involuntary, it must have been caused by government overreaching. <u>Colorado v. Connelly</u>, 479 U.S. 157, 163-64 (1986) ("[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law"). There is absolutely no indication of any coercive police activity in this case. As indicated above, the detectives scrupulously followed the dictates of <u>Miranda</u>. Routine booking questions were asked and answered, <u>Miranda</u> warnings were provided, the defendant invoked his <u>Miranda</u> rights, and questioning ceased.

Thus, the defendant's post-arrest statements and actions, including the defendant's attempts

to change the shape of his face by blowing air in his cheeks when he was photographed, should be admissible at trial.

C.    <u>Motion to Sever Counts</u>

In cases involving a single defendant, Fed. R. Crim. P. 8(a) permits joinder of multiple offenses in the same indictment or information. Joinder of offenses is permitted under Rule 8(a) if the offenses are: (1) of the same or similar character; (2) based on the same act or transaction; or (3) based on acts or transactions that are connected or constitute parts of a common scheme. In the case now before the Court, joinder is appropriate because the defendant's offenses are all of the same or similar character. As a preliminary matter, the charges in the indictment encompass virtually identical acts. In fact, of the seven charges, *three* involve the same bank, as the defendant robbed the Washington First Bank located at 1500 K Street, NW, Washington, D.C., on three separate occasions during the 10-week period, and two others involve the same bank, as the defendant robbed the United Bank, located at 1875 I Street, NW, Washington, D.C., on two separate occasions during the 10-week period. Furthermore, the defendant's modus operandi at each of the charged robberies is very similar. In all but one of the robberies, the defendant handed the bank teller a note, which he then retrieved before fleeing the scene. In six of the robberies, the defendant wore hat, and at times he used other methods to cover his features (i.e. sunglasses, a scarf, an umbrella). "Trial courts routinely allow joinder of different bank robbery counts against a single defendant in the same indictment." <u>United States v. Acker</u>, 52 F.3d 509, 514 (4th Cir. 1995) (holding that the defendant was not entitled to separate trial on each of four counts arising out of four separate bank robberies, where all robberies involved black female, apparently alone, and dressed in basically the same disguise).

In this case, the similarities between the charged offenses more than qualify as offenses "of the same or similar character" as required by Rule 8(a).   See, e.g., United States v. Melendez, 301 F.3d 27, 35 (1st Cir. 2002) (joinder of two drug counts proper because both counts involved same drug); United States v. Tubol, 191 F.3d 88, 95 (2d Cir. 1999) (joinder of gun possession and robbery charges proper because witnesses testified robber had gun and "same evidence [would] support both of the joined counts"); United States v. Hang Le-Thy Tran, 433 F.3d 472, 477 (6th Cir. 2006) (joinder of two arson charges proper because evidence overlapped when two of defendant's businesses showed similar characteristics of arson within short time period and witnesses for each count overlapped); United States v. Lanas, 324 F.3d 894, 899-900 (7th Cir. 2003) (joinder of mail fraud charges proper, despite differences in dates and addresses, in part because all charges similar or same); United States v. Tyndall, 263 F.3d 848, 850 (8th Cir. 2001) (joinder of two separate sexual assault charges proper in part because offenses were "similar"); United States v. Rousseau, 257 F.3d 925, 932 (9th Cir. 2001) (joinder proper because multiple felon-in-possession charges were offenses of "same or similar character"); United States v. Janus Indus., 48 F.3d 1548, 1557 (10th Cir. 1995) (joinder of marijuana and drug paraphernalia offenses proper because they were of "same or similar character"); United States v. Hersh, 297 F.3d 1233, 1241-42 (11th Cir. 2002) (joinder of child pornography counts with travel and transport counts proper because "offenses need only be similar in category, not in evidence" and because each reflected defendant's "repeated participation in the sexual exploitation of minors").

Because joinder is designed for judicial economy, an important factor in determining whether transactions are connected is whether evidence supporting the separate counts sufficiently overlaps so that the same evidence would be admissible at separate trials. See, e.g., United States v.

Boulanger, 444 F.3d 76, 88 (1st Cir. 2006) (joinder of multiple counts proper because similar evidence would have been used for each); United States v. Stewart, 433 F.3d 273, 314 (2d Cir. 2006) (joinder of multiple counts in stock fraud case proper because transaction involved similar factual elements and same evidence offered to establish each charge); United States v. Ballis, 28 F.3d 1399, 1408-09 (5th Cir. 1994) (joinder of bank-fraud related counts with obstruction of justice and false statements counts proper because same evidence would have been admissible in separate trials); United States v. Saadey, 393 F.3d 669, 678 (6th Cir. 2005) (joinder proper when government used overlapping financial evidence in tax and fraud charges against defendant); United States v. Little Dog, 398 F.3d 1032, 1038 (8th Cir 2005) (joinder of sexual abuse and obstruction charges proper because evidence of defendant's attempt to tamper with witnesses could be used to show criminal intent and state of mind at sexual abuse trial); United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002) (joinder of child pornography counts and travel and transportation of a minor counts proper because witness's testimony established evidentiary overlap).

As demonstrated in the recitation of facts provided above, and in the government's Notice of Intent to Introduce Other Crimes Evidence, in the event of eight trials (each dealing with a separate bank robbery) proof of each offense would be admissible in the other trial pursuant to Rule 404(b) of the Federal Rules of Evidence.  As such, there would be no benefit received to the Court - there would be eight trials, costs would be incurred eight times, witnesses would be inconvenienced, and additional delays would be imposed in bringing the defendant to trial. Furthermore, since the defendant robbed the same Washington First Bank on three separate occasions, and the same United Bank on two separate occasions, there are a number of overlapping witnesses.  One civilian witness was present for all three Washington First robberies, and another

civilian witness was present for two of the Washington First robberies. Two civilian witnesses were present for both of the United Bank robberies. Furthermore, the same law enforcement witnesses (members of the MPD/FBI joint Bank Robbery Task Force) were involved in investigating each robbery. And finally, the two March 26, 2008 events (the robbery of Washington First Bank, and the attempted robbery of Urban Trust Bank), are connected by the defendant's path between the two banks through the Hilton Hotel, which led to the identification of the defendant. It is difficult to imagine how these incidents could be presented separately. In determining whether two or more acts or transactions are "connected" under Rule 8(a), the court should look to whether there is a "logical relationship" between them and/or whether there is "a substantial overlap of issues and evidence." United States v. Perry, 731 F.2d 985, 990, 992 (D.C. Cir. 1984). There is clearly a substantial overlap of issues *and* evidence in these cases.

This Court has construed Rule 8(a) broadly in favor of joinder. See, e.g., United States v. Gibbs, 904 F.2d 52, 56 (D.C. Cir. 1990) ("[T]his court . . . has repeatedly declared that joint trials may be preferred, given the heavy and increasing criminal case load in our trial courts."). Other jurisdictions have done the same. See, e.g., United States v. Cardwell, 433 F.3d 378, 385 (4th Cir. 2005) (Rule 8(a) allows broad joinder because it is efficient to try defendant on related counts together during same trial); United States v. Butler, 429 F.3d 140, 146 (5th Cir. 2005) (Rule 8 is construed broadly "in favor of initial joinder"); United States v. Graham, 275 F.3d 490 (6th Cir. 2001) ("The district court may, to the extent it is consistent with due process principles, construe the Rule broadly to 'promote the goals of trial convenience and judicial efficiency.'" (quoting United States v. Wirsing, 719 F.2d 859, 862 (6th Cir. 1983))); United States v. Little Dog, 398 F.3d 1032, 1037 (8th Cir. 2005) (favoring a broad interpretation of Rule 8 in the interest of the "efficient

administration of justice"); United States v. Heckard, 238 F.3d 1222, 1231 (10th Cir. 2001) (Rule 8(a) "broadly allows joinder of offenses"); United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002) (construing Rule 8(a) "broadly in favor of initial joinder" in review of joinder of child pornography counts with travel and transport counts involving transportation of minors).

The defendant's request for severance also relies on the D. C. Circuit opinion in Cross v. United States,  335 F.2d 987 (1964), where that court recognized that where the defendant wishes to testify as to one offense, but does not wish to testify as to another, he may suffer from having the charges tried together.  However, a defendant's election "to testify on some but not all of the charges on trial does not automatically require . . . severance."  Bradley v. United States, 433 F.2d 1113, 1122 (D.C. Cir. 1969).  See also Blunt v. United States, 404 F.2d 1283, 1289 (D.C. Cir. 1968); Baker v. United States, 401 F.2d 958, 976 (D.C. Cir. 1968).   A bare assertion of potential prejudice is not sufficient to trigger severance.  "Such a rule, in fact, would divest the court of all control over the matter of severance and entrust it to the defendant."  Baker 401 F.2d at 976.

> [N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other.  In making such a showing, it is essential that the defendant present enough information - regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other - to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of "economy and expedition in judicial administration" against the defendant's interest in having a free choice with respect to testifying.

Id. at 977 (footnotes omitted).  See also United States v. Dixon, 184 F.3d 643 (7th Cir.1999) (denial of severance did not prejudice defendant where he wished to testify on attempted sexual abuse charge but remain silent with respect to aggravated sexual abuse charge, and where defendant failed

16

to point to any specific harm that would result from his testifying on the attempted sexual abuse charge); United States v. Martin, 18 F.3d 1515 (10th Cir.) (denial of severance did not prejudice defendant who wished to remain silent on two of eight counts and testify on four others, where his proffered testimony did not constitute the "important testimony" necessary to establish a need for severance), cert. denied, 513 U. S. 868 (1994).  Thus, the defendant must present information about the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the others, to establish that the claim of prejudice is genuine.

Here, the defendant has failed to make any showing as to why a severance is required. He offered no proffer of what he had to say regarding any of the counts, nor did he present any reasons for wishing to testify on certain counts and  remaining silent on the other counts.  Thus, the court has no way of determining whether any purported claim of prejudice is genuine or not, and can not intelligently weigh the considerations of judicial economy against the defendant's interest in having a free choice with respect to testifying.

Nor is severance appropriate merely because proof of one count is much more substantial than proof of remaining counts.  See, e.g., United States v. Hang Lee-Thy Tran, 433 F.3d 472, 478 (6th Cir. 2006) (a difference as to the quantum of evidence "is not grounds to overturn a denial of severance unless there is a substantial risk that the jury could not compartmentalize or distinguish between the evidence" produced on each count (quoting United States v. Williams, 711 F.2d 748, 751 (6th Cir. 1983))); United States v. Manganellis, 864 F.2d 528, 543 (7th Cir. 1988) (joinder not prejudicial when proof of one count is very substantial and proof of other counts is less strong in a case with nearly identical defenses on each count); United States v. Moyer, 313 F.3d 1082, 1085 (8th Cir. 2002) (joinder of counts not prejudicial solely because evidence stronger on first set of counts

than on second set of counts); <u>United States v. Wiseman</u>, 172 F.3d 1196, 1212 (10th Cir. 1999)

(joinder of offenses not prejudicial merely because evidence on some counts stronger than evidence

on other counts).

## III.  Conclusion

For the foregoing reasons, the United States respectfully requests that the Court deny

defendant's  Motion to Suppress Identification Evidence, Motion to Suppress Statements and

Related Evidence; and  Motion to Sever Counts for Prejudicial Joinder Pursuant to Rule 14.


Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney


_____/s/_____
Catherine K. Connelly
Assistant United States Attorney
Mass.  Bar No. 649430
555 4th Street, N.W.  #4844
Washington, D.C. 20001
202-616-3384